LAKEHEAD PIPE LINE COMPANY, INC., and Interprovincial Pipe Line Inc., Plaintiffs,

v.

AMERICAN HOME ASSURANCE COMPANY, et al., Defendants.

Civ. No. 5–95–42(MJD/RLE).

United States District Court, D. Minnesota, Fifth Division.

Aug. 19, 1997.

Laurie Jean Miller, Leo G. Stern, Richard D. Snyder, Crystal Olsen Glynn, Fredrikson & Byron, Minneapolis, MN, for Plaintiffs.

E. Curtis Roeder, Tony Raymond Krall, Kevin J. Kennedy, Kelly C. Dohm, David Makoto Hudson, Hanson Lulic & Krall, Minneapolis, MN, for Defendants.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Motion of the Plaintiffs Lakehead Pipe Line Company, Inc., and Interprovincial Pipe Line Inc. ("Lakehead"), to Require Unauthorized Foreign or Alien Insurers to Post Bond, and the Motion of the Defendant Primary Insurers to Compel Arbitration or, in the alternative, to Bifurcate Trial.

A Hearing on the Bond Motion was conducted on December 12, 1996, at which time Lakehead appeared by Leo G. Stern, Esq., and the Primary Insurers appeared by Norman M. Abramson, Esq. With respect to the Arbitration Motion, consistent with the parties' agreement, the issues have been considered by the Court upon their written submissions and, for these purposes, Lakehead has appeared by Richard D. Snyder, Esq., and the Primary Insurers have appeared by Kelly C. Dohm, Esq.

For reasons which follow, we grant both Motions.

## II. *Factual and Procedural Background*

On March 3, 1991, a pipeline, which was owned and operated by Lakehead, ruptured near the City of Grand Rapids, Minnesota, with resultant claims of injury by various property owners who resided in areas adjacent to the rupture. When efforts to resolve the claimed injuries proved unsuccessful, an action was commenced in this Court on June 11, 1991, by certain of the property holders, entitled *"Anderson et al. v. Lakehead Pipe Line Co., Inc."*

Pursuant to a general liability policy, the Primary Insurers defended the interests of Lakehead in the *Anderson* proceeding, and indemnified Lakehead for a percentage of the proceeds, which were expended in settling that case, in the Summer of 1993. During the pendency of the *Anderson* matter, on or about February 27, 1992, Lakehead commenced a declaratory judgment action against the Primary Insurers, in Minnesota District Court, in order to obtain a determination of Lakehead's right to recover its claimed business interruption losses, that were occasioned by the pipeline rupture, from the Primary Insurers' general liability policy. The commencement of that action was prompted by a provision in the underlying policy which required that any such claim be initiated within one year after the claimed loss and, soon after its filing, the parties entered into a stipulated tolling agreement, which preserved their right to bring certain claims against the other, after the completion of the claims adjustment process, and which allowed the dismissal of the State Court action, on February 11, 1993.

Along with its other claims, Lakehead submitted claims of loss to the Primary Insurers, under Policy No. 102610 ("Primary Policy"),[1] which were assertedly attributable to the interruption of Lakehead's business, that

resulted from the pipeline failure, as well as to certain property damage which was asserted to have been caused by the pipeline's rupture. On March 26, 1992, the Primary Insurers notified Lakehead that its Proofs of Loss, which had been submitted for these claims, were formally rejected, due to "[o]verstatement in the amount and scope of the claim[,]" and because of the "[i]nclusion of inaccurate policy information including but not limited to the expiration date[.]" Thereafter, on March 17, 1995, Lakehead commenced this proceeding, in which it seeks a declaration that the Primary Insurers are obligated, under the Primary Policy, to indemnify Lakehead for its losses attributable to the failure of its pipeline.

## III. *Discussion*

### A. *Lakehead's Motion to Require Unauthorized Foreign or Alien Insurers to Post Bond.*

Minnesota Statutes Section 60A.21, which is entitled the "Unauthorized Insurers Process Act," provides a mechanism by which service of process can be effected upon insurers who transact business in Minnesota without State authorization. As expressed by the Minnesota Legislature, the purpose behind the Statute, which was originally enacted in 1967, is as follows:

> The legislature declares that it is the subject of concern that many residents of this state hold policies of insurance issued or delivered in this state by insurers while not authorized to do business in this state, thus presenting to such residents the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies. In furtherance of such state interest the legislature herein provides a method of substituted service of process upon such insurers and declares that in so doing it exercises its powers to protect its residents and to define for the

---

1. The Primary Policy is a "subscription" policy; that is, a policy in which numerous underwriters or insurers agree to be liable for a designated portion or percentage of the coverage, in exchange for the receipt of a corresponding percentage of the premium payments. As such, individual subscribers to the Policy are separately liable only for their proportionate share of a particular loss, and are not jointly and severally liable. Furthermore, many of the Primary Policy's subscribers participated in the subscription as part of one of several "syndicates", which, in turn, are comprised of a group of several underwriters who are liable for a fixed percentage of the Policy's coverage, but who have further subdivided that percentage amongst the members of the syndicate.

purpose of this statute what constitutes doing business in this state and also exercises powers and privileges available to the states by virtue of [Title 15 U.S.C. § 1011 et seq.], which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states.

*Minnesota Statutes Section 60A.21, Subdivision 1.* Title 15 U.S.C. § 1011 *et seq.,* which is also known as the "McCarran–Ferguson Act of 1945," was enacted by Congress as a response to the Supreme Court's decision, in *United States v. South–Eastern Underwriters Assn.,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), in which the Court held that insurance constitutes "commerce," within the meaning of the Commerce Clause. See, *Western & Southern L.I. Co. v. Bd. of Equalization,* 451 U.S. 648, 653, 101 S.Ct. 2070, 2075, 68 L.Ed.2d 514 (1981). By its enactment of the McCarran–Ferguson Act, "Congress removed all Commerce Clause limitations on the authority of the States to regulate and tax the business of insurance * * *." *Id.*

At issue in the Motion before us is the third subdivision of Section 60A.21, which provides, in pertinent part, as follows:

(1) Before any unauthorized foreign or alien insurer shall file or cause to be filed any pleading in any action, suit, or proceeding instituted against it such unauthorized insurer shall:

(a) Deposit with the administrator of the court in which such action, suit, or proceeding is pending cash or securities or file with such administrator a bond with good and sufficient sureties to be approved by the court in an amount to be fixed by the court sufficient to secure the payment of any final judgment which may be rendered in such action; or

(b) procure a certificate of authority to transact the business of insurance in this state.

(2) The court in any action, suit, or proceeding in which service is made in the manner provided in clauses (2) or (3) of subdivision 2 hereof, may, in its discretion, order such postponement as may be necessary to afford the defendant reasonable opportunity to comply with the provisions of clause (1) of this subdivision and to defend such action.

A "foreign" insurer is defined as a "compan[y] incorporated or organized in any other state or country[,]" *Minnesota Statutes Section 60A.02, Subdivision 6,* while an "alien" insurer denotes "an insurer domiciled outside of the United States, but conducting business within the United States." *Id., Subdivision 19.* The term "unauthorized insurer" is not defined in Chapter 60A, however, Minnesota Statutes Section 72A.491, Subdivision 22 defines "unauthorized insurer" as "an insurance company that has not been granted a certificate of authority by the [Commissioner of Commerce] to transact the business of insurance in this state."

Counsel for Lakehead advises that he has contacted the Minnesota Commissioner of Commerce, and has been informed by that Office that five of the Primary Insurers—specifically, R.A.F. McMillian Syndicate ("R.A.F."), Canadian Home Assurance Company ("Canadian"), Christiania General Insurance Corporation of New York ("Christiania"), Worcester Insurance Company ("Worcester"), and United Reinsurance Corporation of New York ("United")—are not certified, or licensed, to transact the business of insurance in this State and, therefore, are "unauthorized foreign or alien insurers." See,·*Affidavit of Leo G. Stern,* at ¶ 18. For their part, the Primary Insurers have not disputed this representation. As a consequence, and consistent with the language of Section 60A.21, Subdivision 3(1)(a), Lakehead has sought to compel these five Defendants to post a bond which represents their share of the $25 million dollars in insurance coverage that is at issue in this litigation. Accordingly, Lakehead requests that these five Insurers be required to post a combined bond in the amount of $16,329,750.[2] In the alter-

---

**2.** Lakehead has arrived at this $16,329,750 figure by computing each Insurer's potential share of the asserted $25 million dollar claim, in a ratio which is in proportion to the Insurer's *pro rata* subscribed share of the Primary Policy's coverage, and by then increasing the dollar figures of these subscription shares to reflect pre-

judgment interest, see, *Minnesota Statutes Section 549.09,* from February 27, 1992—which is the date on which Lakehead filed its claim for business interruption loss. In accordance with these computations, Lakehead represents that, to satisfy the requirements of Section 60A.21, Sub-

native, Lakehead seeks to have the pleadings of these Defendants stricken for failure to post the required security.

■ In opposing Lakehead's Motion, the Primary Insurers raise several contentions, each of which we address in turn.[3]

1. *The Primary Insurers' Statutory Arguments*

The Primary Insurers' chief contention is that the provisions of Section 60A.21 do not apply to them because they were not "transacting insurance business" in Minnesota, as the Statute contemplates. We disagree.

■ Section 60A.21, Subdivision 2, provides for service of process on any unauthorized insurer who should engage, within the State, in any one of the following acts:

a. the issuance or delivery of contracts of insurance to residents of [Minnesota] or to corporations authorized to do business therein;

b. the solicitation of applications for such contracts;

c. the collection of premiums, membership fees, assessments, or other considerations for such contracts; or

d. any other transaction of insurance business * * *[4]

Here, the five Primary Insurers urge that they have not "transacted insurance business" in Minnesota because, at the time that the Primary Policy was issued, neither Lakehead nor its parent corporation was a resident of Minnesota. This argument, however, ignores the plain language of Section 60A.21, Subdivision 2(1)(a), which encompasses the issuance, or the delivery, of an insurance contract to either a resident of the State *or* to a corporation which is authorized to do business therein, and the Record is devoid of any suggestion that Lakehead, or its parent corporation, was not so authorized.

division 3(1)(a), the five Primary Insurers are obliged to post security in the following amounts:

| | |
|---|---|
| R.A.F.— | $ 9,225,000 |
| Canadian— | $ 5,967,000 |
| Christiania— | $ 615,000 |
| Worcester— | $ 307,500 |
| United— | $ 215,250 |
| Total | $16,329,750 |

The Primary Insurers have not disputed the accuracy of these calculations.

3. Our independent research has failed to disclose a single Minnesota decision which has construed the bond provisions of Section 60A.21, Subdivision 3(1)(a), nor have the parties drawn any to our attention. However, Section 60A.21 was modeled after the Uniform Unauthorized Insurers Process Act, and approximately forty other States have enacted analogous statutes, using the Model Act as their guide. See, *Curiale v. Ardra Insurance Co., Ltd.*, 595 N.Y.S.2d 186, 188, 189 A.D.2d 217, 221 (N.Y.App.Div.1993), aff'd, 88 N.Y.2d 268, 667 N.E.2d 313, 644 N.Y.S.2d 663 (1996). Accordingly, where appropriate, we draw guidance from those decisions which have construed the analogous provisions of the counterparts of Section 60A.21, Subdivision 3(1)(a). In addition, such pre-answer security statutes, like Section 60A.21, are substantive rather than procedural in nature and, therefore, pursuant to *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), in an action such as this, where jurisdiction is premised upon the Court's diversity of citizenship jurisdiction, a Federal Court is bound by the provisions of such statutes. See, e.g., *Internat'l Surplus Lines Ins. Co. v. Certain Underwriters at Lloyd's*, 868

F.Supp. 923, 925 (S.D.Ohio 1994); *Moore v. National Distillers and Chemical Corp.*, 143 F.R.D. 526, 530–31 (S.D.N.Y.1992), aff'd, 69 F.3d 1226 (2nd Cir.1996); *T.P.K. Const. Corp. v. Southern American Ins. Co.*, 739 F.Supp. 213, 216 (S.D.N.Y.1990); *Akron Company v. Fidelity General Insurance Co.*, 7 Ohio Misc. 287, 250 F.Supp. 201, 202–03 (1964).

4. Similarly, transacting in unauthorized insurance business—that is, without State certification—is both prohibited, and defined, in Minnesota Statutes Section 72A.41, Subdivision 2. Accordingly, an unauthorized insurer transgresses the provisions of this Statute when it engages in any of the following conduct, which is deemed to constitute the transaction of business within the State:

1. the issuance or delivery of a contract of insurance or annuity to a resident of [Minnesota];
2. the solicitation of an application for such a contract;
3. the collection of a premium, membership fee, assessment or other consideration for such a contract; or
4. the transaction of any matter subsequent to the execution of such a contract and arising out of it.

*Minnesota Statutes Section 72A.41, Subdivision 2.* Notably, unlike Section 60A.21, this Statute only references the issuance, or the deliverance, of a contract or annuity to a "resident," whereas Section 60A.21 references the issuance, or delivery, to either a resident, or to a corporation, which is authorized to do business in the State.

Furthermore, we conclude that any argument, that the five Primary Insurers were not "transacting insurance business" in this State, has been foreclosed—albeit implicitly—by the Minnesota Supreme Court's decision in *Domtar, Inc. v. Niagara Fire Insurance Co.*, 533 N.W.2d 25 (1995), cert. denied, —— U.S. ——, 116 S.Ct. 583, 133 L.Ed.2d 504 (1995). In *Domtar*, a Canadian corporation owned certain environmentally contaminated property, which was located in Duluth, Minnesota. The owner brought a declaratory action, in State Court, seeking a determination that its insurer—also a Canadian corporation—was obligated to reimburse it for its expenses arising from its efforts to combat the environmental contamination. As related by the Minnesota Supreme Court, the insurer in *Domtar* bore many striking resemblances to the five Primary Insurers:

> Canadian General is a Canadian corporation whose principal place of business is located in Scarborough, Ontario, Canada. Canadian General is not now and never has been licensed to do business in Minnesota. Canadian General asserts that it does not maintain, and never has maintained, any offices, employees, or agents in Minnesota. Canadian General asserts that it has no bank accounts in Minnesota and owns no real or personal property in Minnesota. Finally, Canadian General asserts that it has not issued any policies of insurance to any resident of Minnesota.

*Id.* at 29.

Nevertheless, the Minnesota Supreme Court concluded that the State District Court properly asserted personal jurisdiction over the insurer, finding that both the requisites of constitutional due process, and those of the State's long-arm Statute, see, *Minnesota Statutes Section 543.19*, had been satisfied. *Id.* at 34–35. Specifically, the Court concluded that, by agreeing to defend its insured against liability for an insured risk which was located in Minnesota, the insurer had purposefully established the necessary minimum contacts, so that the State's exercise of personal jurisdiction over the insurer offended neither due process, nor the long-arm Statute. *Id.*

■ Admittedly, in reaching this conclusion, the Court in *Domtar* did not state,

expressly, that the insurer had "transacted insurance business" in Minnesota, for the specific issue before the Court was one of personal jurisdiction. Nevertheless, Section 60A.21 is primarily concerned with the service of process upon an unauthorized or alien insurer—a central concern before the Court in *Domtar*—and, therefore, we conclude that *Domtar* supports the conclusion that an alien, or foreign, insurer has "transacted insurance business" in the State where, as here, it has insured property which is located in the State, and where the asserted liability of the insured has arisen from acts within that State. *Id.*

■ As an alternative statutory interpretation, the five Primary Insurers have urged that they have been expressly exempted from the literal terms of Section 60A.21, because the Section does not apply to any action or proceeding against an unauthorized, or alien insurer, which involves any of the following:

> (a) wet marine and transportation insurance;
>
> (b) insurance on or with respect to subjects located, resident, or to be performed wholly outside of this state, or on or with respect to vehicles or aircraft owned and principally garaged outside of this state;
>
> (c) insurance on property or operations of railroads engaged in interstate commerce; or
>
> (d) insurance on aircraft or cargo of such aircraft * * *

*Minnesota Statutes Section 60A.21, Subdivision 2(6).*

Seizing upon the first clause of this Subdivision—and, specifically, the word "transportation"—the Primary Insurers argue that the Primary Policy afforded "transportation" insurance, since the pipeline "transports" oil, much in the way that a fuel truck would. This argument, however, ignores the fact that, within the insurance industry, the phrase "wet marine and transportation insurance" is a specific "term of art," which does not implicate general transportation concerns but, rather, which denote the insurance of marine vessels, their cargoes, and their owners' particularized risks. See, *Aqua–Marine*

*Constructors, Inc. v. Banks,* 110 F.3d 663, 676–77 (9th Cir.1997); *Florida Insurance Guaranty Association v. Pilings & Structures, Inc.,* 616 So.2d 532, 533 (Fla.App.1993), pet. for review denied, 626 So.2d 205 (Fla. 1993) (Table) Given this accepted industry definition, we reject the Primary Insurers' attempt to separate the term "transportation" from the remainder of the operative phrase, in order to attach a meaning which it cannot reasonably bear.

### 2. *The Primary Insurers' Laches, Waiver and Estoppel Arguments.*

■ Next, the Primary Insurers argue that the doctrine of laches prevents Lakehead from seeking to enforce, at this juncture, the security requirements of Section 60A.21. In this respect, the Primary Insurers emphasize that Lakehead did not bring this Motion until some one-and-a-half years after this action was commenced.[5]

Application of the doctrine of laches involves a factual determination in each case. Accordingly, "[t]he basic question is 'whether there has been such an unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief prayed for.'" *Harr v. City of Edina,* 541 N.W.2d 603, 606 (Minn. App.1996), quoting *Fetsch v. Holm,* 236 Minn. 158, 163, 52 N.W.2d 113, 115 (1952). The doctrine's purpose is "to prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay." *Id.,* quoting *Aronovitch v. Levy,* 238 Minn. 237, 242, 56 N.W.2d 570, 574 (1953). Therefore, "[p]rejudice 'to those who have equities to be protected' is not always essential for application of laches but it is significant in the determination of whether the delay was reasonable." *Wheeler v. City of Wayzata,* 533 N.W.2d 405, 409 (Minn.1995), quoting *Aronovitch v. Levy,* supra at 242–43, 570; see also, *Harr v. City of Edina,* supra at 606 ("While evidence of prejudice is not always essential to the application of laches, it is a circumstance of importance in determining whether a plaintiff's delay was reasonable.").

■ Here, we are unable to determine how the delay in bringing this Motion has prejudiced the five Primary Insurers, since they now confront the same bond requirement, that they would otherwise have faced, if this Motion had been filed at an earlier juncture in this action. The only practical effect of the delay would be to increase the amount of the bond which is necessary to cover any prejudgment interest but, since the language of Section 60A.21, Subdivision 3(1)(a) requires that the bond be "sufficient to secure the amount of any final judgment which may be rendered in such action," the Primary Insurers would be under an obligation to add surety for an increasing amount of prejudgment interest, as that interest should accrue.

■ As a related contention, the Primary Insurers assert that Lakehead has waived its right to seek security, by not bringing this Motion at an earlier time. Those Courts which have addressed this issue, however, have found that any time which has elapsed, between the commencement of the suit, and a motion to compel a bond—even if considerable—does not result in a waiver. See, *Curiale v. Phoenix General Insurance Company of Greece, S.A.,* 1992 WL 320535 *1 (S.D.N.Y.

---

5. We reject the Primary Insurers' assertion that Lakehead's failure to request the posting of a Section 60A.21 security in February of 1992—when it filed its State Court declaratory action—has significance to the Motion before us. Notably, Lakehead represents, without contradiction, that the parties entered into the tolling agreement which resulted in the dismissal of the State Court action before any of the defendants in that action—including the five Primary Insurers—ever filed an Answer, or some other responsive pleading. Of course, the requirement that an unauthorized or alien insurer provide a bond does not arise until the insurer attempts to file a pleading in an action in which it is the defendant. *Minnesota Statutes Section 60A.21, Subdivision 3(1);* see also, *Moore v. National Distillers and Chemical Corp.,* supra at 531–32 (language of New York's unauthorized insurers' process act "does not require a timely demand of pre-answer security; the language only sets a trigger for security (that being before a defendant undertakes to defend the action)."). As a consequence, Lakehead's failure to demand that the Primary Insurers produce a bond, at the time of the filing of its State Court action, is of no legal import, since the Primary Insurers were never under a legal obligation to post a security during that State Court proceeding.

1992); *Moore v. National Distillers and Chemical Corp.*, 143 F.R.D. 526, 531–32 (S.D.N.Y.1992), aff'd, 69 F.3d 1226 (2nd Cir. 1996). Indeed, in *Moore v. National Distillers and Chemical Corp.*, supra at 532, the Court accepted the plaintiff's argument that, because New York's analogous unauthorized insurers' process act "[wa]s intended to protect the public, it cannot be waived." While we do not entirely foreclose the possibility that a plaintiff could waive the benefits of Section 60A.21, given the Minnesota Legislature's expressed "concern that many residents of this state hold policies of insurance issued or delivered in this state by insurers while not authorized to do business in this state, thus presenting to such residents the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies[,]" see, *Minnesota Statutes Section 60A.21, Subdivision 1*, we are disinclined to find such a waiver under the circumstances presented here.

■ Next, the Primary Insurers urge that Lakehead is equitably estopped from now seeking the posting of a surety bond. Equitable estoppel is available when the following conditions obtain:

1. there has been a misrepresentation of a material fact;

2. the party to be estopped knew or should have known that the representation was false;

3. the party to be estopped intended that the representation be acted upon;

4. the party asserting equitable estoppel lacked knowledge of the true facts; and

5. the party asserting the estoppel did, in fact, rely upon the misrepresentation to his or her detriment.

*Transamerica Ins. Group v. Paul.* 267 N.W.2d 180, 183 (Minn.1978). As we understand their estoppel argument, the Primary Insurers contend that, as part of the 1992 tolling agreement between the parties, Lakehead induced the Primary Insurers into consenting to proceed in this Court, rather than proceeding in an alternate forum—such as Wisconsin—which has no bond requirement for unauthorized insurers. As a result of this purported inducement, the Primary Insurers argue that Lakehead should now be estopped from demanding their compliance with the bond requirement.

We are not persuaded by this argument, however, since there has been no showing that Lakehead made any misrepresentations to the Primary Insurers concerning the application of Section 60A.21. Rather, it appears that the requirements of the Section were never addressed, or contemplated, during the parties' earlier negotiations. Accordingly, we conclude that the Primary Insurers "[have] not relied upon any act, representation, or omission of [Lakehead,] but only upon [their] own misconception of the law." *Grier v. Estate of Grier,* 252 Minn. 143, 150, 89 N.W.2d 398, 404 (1958). Under such circumstances, the Primary Insurers may not resort to estoppel to defeat the Plaintiffs' Motion.

**3. *The Primary Insurers' Constitutional Arguments.***

As a final contention, the Primary Insurers argue that subjecting them to the bond requisites of Section 60A.21 violates the Constitution. First, they maintain that "[t]o allow a Minnesota statute to require the posting of bond on a policy which was solicited, drafted, negotiated, issued, delivered and paid for outside of Minnesota violates the Subject Defendants' right to Due Process." We disagree.

■ As an initial observation, it bears underscoring that the Primary Insurers have never challenged this Court's exercise of personal jurisdiction over them and, indeed, at this stage of the litigation, they could not properly raise such a challenge. See, *Rule 12(h)(1), Federal Rules of Civil Procedure* ("A defense of lack of jurisdiction over the person * * * is waived * * * if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a. matter of course."). As a consequence, the Primary Insurers' due process challenge cannot be styled as one implicating personal jurisdiction but, instead, the due process challenge appears to be a vaguely articulated interest in avoiding State regulation, in the absence of what the Primary Insurers consider to be a sufficient

relationship with the State. Such an interest, however, is not a sufficient predicate upon which to premise a due process challenge. See, *Curiale v. Ardra Insurance Company, Ltd.*, 88 N.Y.2d 268, 277, 667 N.E.2d 313, 319, 644 N.Y.S.2d 663, 669 (1996) ("the ability to conduct insurance business free from legitimate government regulation is not a constitutionally protected property or liberty interest."). Accordingly, numerous Courts have rejected similar due process challenges to the bond requirements of analogous unauthorized insurers service of process Acts. See, *Curiale v. Ardra Insurance Company, Ltd.*, supra at 277, 667 N.E.2d at 319, 644 N.Y.S.2d at 669; *Mid-American Indemnity Ins. Co. v. King*, 1995 WL 407388 *7, —— S.W.2d —— (Tex., July 7, 1995); *American Centennial Insurance Company v. Seguros La Republica, S.A.*, 1992 WL 147626 * 1 (S.D.N.Y., June 16, 1992); *Trihedron Internat'l Assurance, Ltd. v. Superior Court*, 218 Cal.App.3d 934, 946–48, 267 Cal.Rptr. 418, 425–26 (Cal.App.1990).

■ In essence, the Primary Insurers' chief argument is that the location, in Minnesota, of the insured property—namely, the pipeline—is insufficient to allow for State regulation of their actions, as insurers, and, in support of this contention, they largely rely upon the decision in *State Bd. Of Ins. v. Todd Shipyards*, 370 U.S. 451, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962), in which the Court determined that the State of Texas could not, consistent with the dictates of due process, collect a sales tax which had been levied on those out-of-state insurance transactions which involved insurance coverage for property located within the State. From *Todd Shipyards*, the Primary Insurers seek to infer the broad proposition that the Due Process Clause forbids a State's regulation of an insurer whose only contact with the State is its contract to provide coverage for property which is located in that State.

The Primary Insurers have read too much into their interpretation of *Todd Shipyard*. Indeed, several years before *Todd Shipyards*, the Supreme Court observed that "prior decisions of this Court have referred to the unwisdom, unfairness and injustice of permitting policy holders to seek redress only in some distant state where the insurer is incorporated," but "[t]he Due Process Clause does not forbid a state to protect its citizens from such injustice." *Travelers Health Ass'n v. Commonwealth of Virginia*, 339 U.S. 643, 649, 70 S.Ct. 927, 930, 94 L.Ed. 1154 (1950), citing *Internat'l Shoe Co. v. State of Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 159–60, 90 L.Ed. 95 (1945); *Pennsylvania Lumbermen's Mutual Fire Inc. Co. v. Meyer*, 197 U.S. 407, 418, 25 S.Ct. 483, 486–87, 49 L.Ed. 810 (1905); *Connecticut Mutual Life Ins. Co. v. Spratley*, 172 U.S. 602, 619, 19 S.Ct. 308, 314–15, 43 L.Ed. 569 (1899). Of course, this is precisely the type of perceived injustice that the Minnesota Legislature sought to rectify by enacting Section 60A.21. See, *Minnesota Statutes Section 60A.21, Subdivision 1*.

Moreover, since *Todd Shipyard* was decided, the Court has rejected constitutional challenges to State regulations of out-of-state insurers which were, in their impact, as onerous as that implicated here. For example, in *Clay v. Sun Insurance Office, Ltd.*, 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229 (1964), after purchasing, in Illinois, a personal property insurance policy which barred claims on the policy after twelve months following the discovery of loss, the insured moved to Florida and brought a claim for loss, after the twelve month period, because of a Florida statute which provided a five-year statute of limitations. The Court allowed the application of the longer statute of limitations, notwithstanding the out-of-state insurer's due process challenge, and found that application to be a proper exercise of Florida's regulatory power, since the property was located in Florida, and the insurer could have foreseen that the insured might remove the personal property to that State. *Id.* at 180–83, 84 S.Ct. at 1197–99. Here, the property at issue was, at all times, located in Minnesota and, therefore, the Primary Insurers could have reasonably foresee that they could be susceptible to Minnesota's regulatory power. *Id.*

Further, in *Western & Southern Life Ins. Co. v. Bd. of Equalization*, 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981), the Court sustained, against a constitutional challenge, an openly discriminatory State tax upon out-of-state insurance companies. *Id.* at 655–74,

101 S.Ct. at 2076–78. Notably, while the Court's discussion primarily focused upon the Insurer's challenges under the Commerce Clause, and under the Fourteenth Amendment's Equal Protection Clause, the Court also rejected the insurer's discrete due process challenge. *Id.* at 656 n. 7, 101 S.Ct. at 2077 n. 7; see also, *Watson v. Employers Liability Corp.*, 348 U.S. 66, 70–73, 75 S.Ct. 166, 168–70, 99 L.Ed. 74 (1954) (Louisiana statute which allowed persons injured in Louisiana to bring direct actions against liability insurance companies insuring the tort-feasors, held to comport with due process, even when applied to policy written and delivered in another state which did not allow direct actions against the insurer). In light of these, and other intervening authorities, at least one Court has concluded that the holding in *Todd Shipyards* has been abrogated. See, *Associated Elec. & Gas Ins. Services, Ltd. v. Clark*, 676 A.2d 1357, 1361 (R.I.1996) ("We no longer exalt form over substance; [a] foreign insurer who manages to collect millions of dollars in premiums for excess liability of four natural-gas utilities that are domiciled within this state creates a purposeful economic presence in the state.") Accordingly, we conclude that the Primary Insurer's reliance upon *Todd Shipyards* is misplaced, and that their due process challenge to the application of the bond requirements of Section 60A.21 must fail.

■ Lastly, the Primary Insurers argue that subjecting them to the security requirement of Section 60A.21 would violate their right to the equal protection of the laws. Correctly noting that a "rational basis" analysis here applies, see, *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2100–01, 124 L.Ed.2d 211 (1993), the Primary Insurers nonetheless insist than the Minnesota Legislature has no rational basis for treating a pipeline insurer any differently than an insurer of a railroad, a marine vessel, or any of the other exempted mobile types of property that are detailed in Section 60A.21, Subdivision 2(6). We cannot agree.

It is axiomatic that, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, supra at 313, 113 S.Ct. at 2101, citing *Sullivan v. Stroop*, 496 U.S. 478, 485, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990); *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 174–79, 101 S.Ct. 453, 459–62, 66 L.Ed.2d 368 (1980) and *Dandridge v. Williams*, 397 U.S. 471, 484–85, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970). Accordingly, "[o]n rational-basis review, a classification in a statute * * * bear[s] a strong presumption of validity, * * * and those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *Id.*, at 314–15, 113 S.Ct. at 2101–02, quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973) [internal citations omitted]. Furthermore, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature[;] * * * [t]hus, the absence of 'legislative facts' explaining the distinction '[o]n the record,' has no significance in rational-basis analysis." *Id.* at 315, 113 S.Ct. at 2102, citing *United States Railroad Retirement Bd. v. Fritz*, supra at 179, 101 S.Ct. at 461–62.

Here, as to their equal protection challenge, the Primary Insurers have not satisfied the heavy burden of demonstrating that there is no "reasonably conceivable state of facts that could provide a rational basis for the classification," of which they complain. Indeed, Lakehead correctly notes that the Minnesota Legislature could rationally have exempted mobile property from the Statute's reach because service of process, which turns on whether the property fortuitously enters a State, would violate the Due Process Clause. See, *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296, 100 S.Ct. 559, 566–67, 62 L.Ed.2d 490 (1980) (If rule were otherwise "[e]very seller of chattels would in effect appoint the chattel his agent for service of process," and "[h]is amenability to suit would travel with the chattel."). Thus, the classification at issue plausibly serves at least one rational basis; namely, the reasonable goal of avoiding unnecessary constitutional chal-

lenges which could otherwise result through the application of Section 60A.21. See, *Minnesota Statutes Section* 645.17 ("In ascertaining the intention of the legislature the courts may be guided by the * * * presumption[ ] * * * [that] the legislature does not intend to violate the constitution of the United States * *."); I see also, *Mid–American Indemnity Ins. Co. v. King,* supra at *6, —— S.W.2d at —— (application of Texas unauthorized insurer bond requirement to insurer does not violate equal protection); *Trihedron Internat'l Assurance, Ltd. v. Superior Court,* supra at 940–45, 267 Cal.Rptr. 418 (same for California's analogous statute).

Accordingly, having rejected each of the arguments for an opposite result, we conclude that Section 60A.21, Subdivision 3(1), by its plain terms, requires the five Primary Insurers to either post security with the Clerk of Court, in the amount of $16,329, 750,[6] or procure a certificate of authority to transact the business of insurance in this State. Nevertheless, recognizing that Section 60A.21, Subdivision 3(2), affords the Court the discretion to "order such postponement as may be necessary to afford [the Primary Insurers] reasonable opportunity to comply with the provisions of [subdivision 2(1) ]", we shall afford the Primary Insurers such an opportunity and, therefore, direct that they take the necessary action to comply with the provisions of Minnesota Statutes Section 60A.21, **by no later than sixty (60) days from the date of this Order.** Should the five Primary Insurers fail to comply with the provisions of Section 60A.21, and of this Order, within the time period noted, we shall enter a recommendation to the District Court that, consistent with Minnesota Statutes Section 60A.21, Subdivision 3(1)(a), their pleadings in this action be stricken.

6. See, supra, footnote 2 and accompanying text.

7. As a threshold argument, Lakehead contends that the damages issue is not arbitrable because the policy clause is an "appraisal" clause, rather than an "arbitration" clause. In this respect, Lakehead is technically correct but, as a practical matter, the distinction is one without a difference. In this respect, "[a]n agreement for arbitration, as that term is now generally used, encompasses the disposition of the entire controversy between the parties upon which [an] award of judgment may be entered, whereas an agreement for an appraisal extends merely to the resolution of the specific issues of actual cash

**B.** *The Primary Insurers' Motion to Compel Arbitration, or, in the Alternative, to Bifurcate Trial.*

By this Motion, the Primary Insurers seek to compel an arbitration as to the amount of Lakehead's asserted damages or, alternatively, they seek bifurcated trials on the issues of liability and damages. Because we agree that determination of the amount of damages is properly arbitrable, we grant the Motion to Compel Arbitration, and we do not reach the bifurcation issue.

In bringing this Motion, the Primary Insurers rely upon the following clause of the Primary Policy:

7. ARBITRATION:

In case the Insured and the Insurers shall fail to agree as to the amount of loss, the same shall be ascertained by two competent and disinterested appraisers, the Insured and Insurers each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers shall submit their differences to the umpire, and the award in writing of any two shall determine the amount of the loss; the parties hereon shall pay the appraisers respectively selected by them and shall bear equally the expense of the appraisal and umpire.

Given this contractual language, the Primary Insurers maintain that, should Lakehead ultimately prevail on the issue of liability, then the determination of the actual amount of any resulting damages should be made through arbitration, and not by a Jury. In opposing the Motion to Compel Arbitration, Lakehead contends that the Primary Insurers have waived their right to seek an arbitration of the damages issue.[7]

value and the amount of loss * * *." *14 Couch on Insurance 2d,* § 50.5, at 164. "This distinction is not always recognized, however, and it has been declared in general terms, without making any distinction between the two, that a board of appraisers, referees, or arbitrators, provided for by a contract of insurance to arbitrate a question of loss, constitutes a quasi court, subject to the principles governing common-law arbitration." *Id.* at 165, citing among other authorities *Itasca Paper Co. v. Niagara Fire Ins. Co.,* 175 Minn. 73, 220 N.W. 425 (1928), and *Christianson v. Norwich Union Fire Ins. Soc.,* 84 Minn. 526, 88 N.W. 16 (1901).

■ Of course, the United States Supreme Court, the Minnesota Supreme Court, and the United States Congress, have each squarely favored the arbitration of disputes, as reflected by the following:

> The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or like defense to arbitrability.

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1982); see also, *Niazi v. St. Paul Mercury Ins. Co.*, 265 Minn. 222, 229, 121 N.W.2d 349, 355 (1963) ("Arbitration has been looked upon with favor in this state."), citing *Zelle v. Chicago & N.W. Ry. Co.*, 242 Minn. 439, 65 N.W.2d 583 (1954).

As with most other contractual rights, however, the right to demand arbitration may be waived. In this respect, a waiver of arbitration occurs when the following conditions are satisfied:

1. The party claiming the right to arbitrate knew of an existing right to arbitration;

2. It acted inconsistently with that right; and

3. It prejudiced the other party by these inconsistent acts.

*Ritzel Communications v. Mid–American Cellular*, 989 F.2d 966, 969 (8th Cir.1993); *Stifel Nicolaus & Co. v. Freeman*, 924 F.2d 157, 158 (8th Cir.1991).

However, "[i]n light of the strong federal policy in favor of arbitration, any doubts concerning waiver of arbitrability should be resolved in favor of arbitration." *Ritzel Communications v. Mid–American Cellular*, supra at 968–69, citing *Nesslage v. York Sec., Inc.*, 823 F.2d 231, 234 (8th Cir.1987); see also, *Stifel Nicolaus & Co. v. Freeman*, supra at 158 ("When considering these factors, we will resolve in favor of arbitration any doubts

concerning * * * [the] allegation of waiver.") [internal citations and quotations omitted]

■ Applying these principles, we conclude that the first of these factors have been satisfied, for the Primary Insurers' recognition of their right to arbitrate is plainly evidenced by both their original, and their Amended Separate Answers, in both of which they have asserted the existence of the arbitration clause as an affirmative defense. We seriously doubt, however, that they have acted inconsistently with that right to arbitration, since any discovery in this action, which would implicate an arbitral issue of damages, has been conducted upon a reservation of the Primary Insurers' interest to have that issue arbitrated.

Moreover, in view of our obligation to resolve all doubts against the waiver of arbitration, we are unable to conclude, on the Record before us, that such a waiver has here occurred. In this respect, we first observe that "[d]elay in seeking to compel arbitration does not itself constitute prejudice." *Stifel Nicolaus & Co. v. Freeman*, supra at 159, citing *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2nd Cir.1985). Furthermore, there is ample evidence to suggest that Lakehead has been aware, since the onset of this litigation, that the Primary Insurers would seek arbitration of the damages issue. As noted, the Primary Insurers raised the arbitration clause as an affirmative defense in their original and Amended Separate Answers, and addressed the issue in their Pretrial Submissions to this Court, in which they purposefully argued that the arbitration clause governed the determination of damages, and that, consequently, there should be no damages discovery in this case. See, *Defendant Primary Insurers' Pretrial Submission*. The argument was reiterated in the parties' Proposed Agenda and Status Report, which was submitted to the Court in anticipation of a January 19, 1996, Status Conference, in which the Primary Insurers proposed to have the case proceed in two phases, with the first

---

In modern cases, the Minnesota Courts have not observed the distinction between an arbitration and an appraisal, see, e.g., *David A. Brooks Ent. v. First Systems Agencies*, 370 N.W.2d 434, 435 (Minn.App.1985); *Beebout v. St. Paul Fire & Marine Ins. Co.*, 365 N.W.2d 271 (Minn.App.

1985), pet. for review denied, (Minn., May 31, 1985), and, accordingly, we conclude that the issue of whether the clause at issue should be styled as an "arbitration clause," or as an "appraisal clause," is an irrelevancy.

phase addressing the coverage issues, and with the second addressing the quantum of any covered damages.[8] Although unsuccessful in this preliminary request for bifurcated discovery, the Primary Insurers prefaced their damages discovery efforts with a caveat that such requests should not be construed as a waiver of their arbitration claim. See, *Defendant Primary Insurers' First Set of Interrogatories and Request for Admissions,* at page 1.

Accordingly, we are not persuaded by Lakehead's contention that the Primary Insurers have waived their right to seek to have the issue of Lakehead's damages arbitrated.[9] Nor are we persuaded by Lakehead's contention that, in rejecting Lakehead's proofs of loss, the Primary Insurers are forever estopped from seeking arbitration. While an unqualified denial of liability, by an insurer, upon the receipt of proofs of loss, can operate as a waiver of the right to arbitrate, see, *Cash v. Des Moines Fire Ins. Co.,* 111 Minn. 538, 126 N.W. 526 (1910); *Moore v. Sun Ins. Office,* 100 Minn. 374, 378–79, 111 N.W. 260, 262 (1907), where, as here, the insurer raises the issue of arbitration within its Answer and, in so doing, has "disclosed an intent * * * not to abandon the arbitration provision[,]" estoppel will not pre-

vent the insurer from seeking a resort to the arbitration clause. *Niazi v. St. Paul Mercury Ins. Co., supra,* 265 Minn. at 230, 121 N.W.2d at 355.[10]

Accordingly, we grant the Primary Insurers' Motion to Compel Arbitration.

NOW, THEREFORE, It is—

ORDERED:

1. That Lakehead's Motion to Require Unauthorized Foreign or Alien Insurers to Post Bond-[Docket No. 76] is GRANTED.

2. **That, by no later than sixty (60) days from the date of this Order,** the five Primary Insurers shall take the necessary action to comply with the provisions of Minnesota Statutes Section 60A.21.

3. That, should the five Primary Insurers fail to comply with the provisions of Section 60A.21, and of this Order, within the time period noted, we shall enter a recommendation to the District Court that, consistent with Minnesota Statutes Section 60A.21, Subdivision 3(1)(a), their pleadings in this action be stricken.

4. That the Primary Insurers' Motion to Compel Arbitration [Docket No. 120] is GRANTED.

---

**8.** This Status Report reveals that the Primary Insurers had deliberately refrained from engaging in damages discovery, and than they had complied with Lakehead's damage discovery requests subject to noted objections.

**9.** In reaching this conclusion, we are mindful of Lakehead's concern that, because of the Primary Insurers' delay in bringing this Motion, Lakehead has been prejudiced by the Primary Insurers' resulting "use of discovery methods unavailable in arbitration * * *." *Stifel Nicolaus & Co. v. Freeman,* 924 F.2d 157, 159 (8th Cir.1991). However, as we have noted, while the parties have engaged in damages discovery, this was accomplished in the face of the Primary Insurers' clearly expressed objection. Accordingly, we believe that the Primary Insurers' intention to file this Motion to Compel Arbitration could not have taken Lakehead by surprise, and Lakehead can claim no prejudice by the damages discovery that has occurred to date. Indeed, had Lakehead so chosen, it could have opposed the Primary Insurers' effort to make "use of discovery methods unavailable in arbitration[,]" by exercising its right to bring its own Motion to compel arbitration, or to seek a Protective Order. See, e.g.,

*Itasca Paper Co. v. Niagara Fire Ins. Co.,* supra at 79, 427; *Orient Ins. Co. v. Skellet Co.,* 28 F.2d 968, 969 (8th Cir.1928). Lakehead elected to do neither.

**10.** Lastly, as a somewhat incidental argument, Lakehead argues that this Motion has been prematurely raised, because the Primary Insurers have not advanced their estimated computation as to the amount of damages which Lakehead has suffered as a result of its asserted business interruption. As a consequence, Lakehead urges that the parties have not "failed to agree" on a quantum of damages and, therefore, the preconditions for an umpiring of competing appraisals have not been fully satisfied. We find this argument to be unavailing for the arbitration of Lakehead's damages would not occur unless, and until, a threshold finding of liability on the issue of insurance coverage had first been resolved. Presumably, by then, the Primary Insurers will have reached a conclusion as to Lakehead's asserted damages, and the quantum of damages issue will have become ripe for arbitration.

5. That the Primary Insurers' Motion to Bifurcate Trial [Docket No. 120] is DENIED, as moot.